UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

COINDELL BRYANT

CRIMINAL ACTION

NO. 25-168

SECTION M

**<u>ORDER & REASONS</u>**

Before the Court is a motion to suppress evidence filed by defendant Coindell Bryant,[1] to which the government responds in opposition.[2]  The Court held a suppression hearing on March 5, 2026.[3]  The government presented the testimony of Detective Makayla Dulaney of the New Orleans Police Department ("NOPD").[4]  Bryant presented the testimony of Jalicha Horton, an investigator employed by the Federal Public Defender's office.  Both parties filed post-hearing memoranda.[5]  Having considered the parties' memoranda, the evidence presented at the hearing, the record, and the applicable law, the Court denies the motion because it finds that Dulaney had reasonable suspicion to stop Bryant, which led to the discovery that he was a felon and his subsequent arrest for being a felon in possession of a firearm.

I.   **BACKGROUND**

At about 4:48 p.m. on March 2, 2025, the Sunday before Fat Tuesday, Dulaney spotted Bryant open-carrying a firearm as he was standing in the street on the lakeside/uptown-bound side in front of 1243 St. Charles Avenue, which is a Popeye's restaurant.[6]  St. Charles Avenue was

---

[1] R. Doc. 27.
[2] R. Doc. 36.
[3] R. Doc. 37.
[4] *Id.*
[5] R. Docs. 39; 40; 43.
[6] Testimony of Dulaney.

closed to traffic because the Krewe of Thoth Mardi Gras parade was rolling on the riverside/downtown-bound side of the street.[7]  Bryant, who was dressed in civilian attire and did not appear intoxicated, was engaged in conversation with another person.[8]  As seen on the footage from Dulaney's body-worn camera and that of NOPD Officer Thomas Ripp, Dulaney pointed out the gun to her fellow NOPD officers and they approached Bryant.[9]   NOPD Sergeant Jonathan Fowlkes grabbed Bryant and then Dulaney also grabbed him.[10]  The officers detained Bryant.[11] Officer James Marx removed the firearm from Bryant's holster, removed the magazine, and ejected the chambered live round.[12]  Fowlkes told Bryant that he was stopped because civilians could not have firearms on the parade route.[13]  No officer told Bryant that he was being stopped for possessing a gun within a firearm-free school zone.[14]  Throughout the encounter, Bryant was cooperative and calm.[15]  He informed the officers that he was working security for a gentleman standing nearby.[16]  None of the officers was familiar with Bryant before this encounter, and they did not know anything about Bryant's criminal history.[17]

Dulaney testified that, prior to the stop, she thought that Bryant was violating laws prohibiting people from carrying firearms on the parade route and within a school zone.[18]  She also testified that at roll call, before her shift began, the officers were instructed that firearms were prohibited on the parade route from sidewalk to sidewalk pursuant to La. R.S. 14:92.2, because

---

[7] Testimony of Dulaney; Government Exhibit D.
[8] Testimony of Dulaney; Government Exhibit D.
[9] Testimony of Dulaney; Government Exhibits B, C, and D.
[10] Testimony of Dulaney; Government Exhibits B, C, and D.
[11] Testimony of Dulaney; Government Exhibits B, C, and D.
[12] Testimony of Dulaney; Government Exhibits B, C, and D.
[13] Government Exhibit B.
[14] Government Exhibits B and C.
[15] Testimony of Dulaney.
[16] *Id.*; Government Exhibit D.
[17] Testimony of Dulaney.
[18] *Id.*

various schools sponsor marching bands, dance teams, and other groups that participate in the parades.[19]  Further, Dulaney testified that, because this incident occurred in her usual patrol district, she knew that Bryant was within the firearm-free zone designated for the Chartwell Center School when she saw him with the gun.[20]  At the hearing, Dulaney admitted that she has not measured the distance between where Bryant was standing and the Chartwell Center School, but she was familiar with the "Firearm-Free Zones" map produced by the New Orleans City Planning Commission ("NOCPC"), which she reviewed for the 2025 Mardi Gras season days before the Thoth parade, and she was certain that Bryant was within the 1,000-foot zone of the Chartwell Center School, as depicted on the map, when she saw him with the firearm.[21]

While the other officers remained with Bryant, Dulaney returned to her patrol car to run a criminal history check on him.[22] Dulaney discovered that Bryant was a convicted felon.[23]  She immediately informed the other officers of Bryant's criminal history at which point Bryant was told to exit the port-a-potty the officers had allowed him to use.[24]  The officers handcuffed Bryant, placed him in the back of Dulaney's patrol car, and advised him of his *Miranda* rights.[25]  Officers then inspected Bryant's firearm, and Dulaney determined that the firearm's serial number had been obliterated.[26]  When asked about the obliterated serial number, Bryant stated that his "Godson did that."[27]  As described in the police report that she authored, Dulaney arrested Bryant for having a firearm in a firearm-free zone in violation of La. R.S. 14:95.2(D)(1) – namely, the Chartwell Center School zone, being a felon in possession of a firearm in violation of La. R.S. 14:95.1, and having

---

[19] *Id.*
[20] *Id.*
[21] *Id.* (referring to Government Exhibit A).
[22] Testimony of Dulaney; Government Exhibit D.
[23] Testimony of Dulaney; Government Exhibit D.
[24] Testimony of Dulaney; Government Exhibit D.
[25] Government Exhibit D.
[26] Testimony of Dulaney; Government Exhibit D.
[27] Testimony of Dulaney; Government Exhibit D.

a firearm with an obliterated serial number in violation of La. R.S. 14:95.7.[28]   The state charges against Bryant were eventually dismissed, and the case was federally adopted.[29]   Bryant was indicted on June 20, 2025, for a single count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).[30]

## II.    PENDING MOTION

Bryant filed the instant motion to suppress, arguing that Dulaney and the other officers lacked reasonable suspicion that he was, or was about to be, engaged in criminal activity when they approached him and initiated the *Terry* stop.[31]   Bryant contends that, when the officers saw him, all they knew was that he had a firearm on a parade route, which he says is not illegal.[32] Bryant argues that the plain language of La. R.S. 14:95.2 does not prohibit firearms on parade routes and the officers' mistaken instruction and belief to the contrary did not create reasonable suspicion for them to stop him.[33]   Bryant further asserts, as a factual matter, that he was not within the Chartwell Center School zone when he was stopped.[34]

In opposition, the government argues that, at the time she initiated the stop, Dulaney had a reasonable belief that Bryant was carrying a gun within the firearm-free zone designated for the Chartwell Center School.[35]   The government further argues that it is irrelevant that the officers told Bryant that he could not have a firearm on a parade route, because even a reasonable mistake of law can be the basis for reasonable suspicion.[36]

---

[28] Testimony of Dulaney; Government Exhibit D.
[29] R. Docs. 1; 27-1 at 3.
[30] R. Doc. 1.
[31] R. Doc. 27-1 at 5.
[32] *Id.*
[33] *Id.* at 5-8.
[34] *Id.* at 8.
[35] R. Doc. 36 at 2-3.
[36] *Id.* at 3.

At the hearing, Dulaney's testimony focused on her belief that, when she initiated the *Terry* stop, Bryant was within the firearm-free zone designated for the Chartwell Center School.[37] Dulaney testified that the Chartwell Center School, and its accompanying firearm-free zone, are within the district to which she is normally assigned.[38]  She often checks the Firearm-Free Zones map produced by the NOCPC and did so throughout the 2025 Mardi Gras season.[39]  For this purpose, Dulaney had used the most recent map dated October 2024.[40]  As a result, Dulaney is familiar with the particular firearm-free zone for the Chartwell Center School and has arrested people in the past for having a gun within it.[41]  Although Dulaney admitted that she has not measured the distance from the Chartwell Center School to the spot where Bryant was stopped, she was sure at the time of his detention that he was within the designated firearm-free zone as depicted on the relevant NOCPC map.[42]

Horton's testimony at the hearing was intended to cast doubt on whether Bryant was within the designated firearm-free zone at the time of the stop.[43]  Horton acknowledged that the October 2024 NOCPC map was the most recent firearm-free zone map available to Dulaney at the time of Bryant's arrest and that it showed that Bryant was within the school zone.[44]  However, Horton attempted to show that the October 2024 map may not have accurately measured the distance from the school to the place where Bryant was stopped.[45]  Horton referred to a July 2024 firearm-free zone map produced by the NOCPC which showed that Bryant was not within the Chartwell Center

---

[37] Testimony of Dulaney.
[38] *Id.*
[39] *Id.*
[40] *Id.* (referring to Government Exhibit D).
[41] *Id.*
[42] *Id.*
[43] Testimony of Horton.
[44] *Id.*; Defense Exhibit A.
[45] Testimony of Horton.

School zone when he was stopped, had that map had been utilized.[46]  Horton also testified that she

believed the size of the school grounds was inflated on the October 2024 map as compared to the

July 2024 version.[47]  Horton further testified that, using a map from the New Orleans City Tax

Assessor's office and one from Google Maps, she drew the distance from what she determined to

be the edge of the Chartwell Center School's property to where Bryant was standing at the time of

the stop, and, by her calculations, he was not within 1,000 feet of the school.[48]

In his post-hearing memorandum, Bryant argues that Dulaney's testimony concerning her

belief that Bryant was within the school zone is not credible because no officer informed Bryant

at the time of the stop that he was in a firearm-free school zone.[49]  Instead, the officers told Bryant

that he could not have a gun on the parade route.[50]  Bryant asserts that Dulaney was uncertain as

to the basis for the stop because she testified that Bryant was stopped for both being in a school

zone and on a parade route with a firearm.[51]  Bryant also claims that Dulaney was uncertain as to

the boundaries of the school zone because she could not say exactly when she last viewed the map

before the stop, exactly where the school is, and that she would have to refer to the map again to

be sure it had not changed since October 2024.[52]  According to Bryant, Dulaney relied on an

incorrect map and he proved he was not in the school zone, meaning Dulaney had no reasonable

basis to stop him.[53]  Bryant further argues that the officers were not reasonable in believing that

La. R.S. 14:95.2 prohibited carrying firearms on parade routes.[54]

---

[46] *Id.*; Defense Exhibits B and C.
[47] Testimony of Horton; Defense Exhibits A, B, and C.
[48] Testimony of Horton; Defense Exhibits D, E, F, and G.
[49] R. Doc. 39 at 1-4.
[50] *Id.*
[51] *Id.* at 2.
[52] *Id.* at 2-3.
[53] *Id.* at 3-4.
[54] *Id.* at 4-5.

The government responds in its post-hearing memorandum, arguing that Dulaney's testimony was credible and consistent, demonstrating that she had a reasonable belief to stop Bryant for carrying a gun in a firearm-free school zone.[55]  The government points out that Dulaney testified that she was assigned to the same post on St. Charles Avenue for the 2025 Mardi Gras season and reviewed the firearm-free zone map in preparation for and in conjunction with that assignment.[56]  According to the government, due to Dulaney's familiarity with the map and the area, she had reasonable suspicion that Bryant was within the Chartwell Center School zone at the time of the stop.[57]  The government further argues that Dulaney was reasonable in relying on the most current firearm-free zone map produced by the NOCPC, the entity tasked by law with making the map.[58]  Finally, the government contends that, because Dulaney had a reasonable suspicion that Bryant was in a firearm-free school zone, the Court need not consider whether La. R.S. 14:95.2 could reasonably be read to prohibit the carrying of firearms on parade routes.[59]

Bryant replies, arguing that Dulaney was unreasonable in relying on the NOCPC's October 2024 firearm-free zone map because the July 2024 version, says Bryant, contained the correct boundaries of the school zone.[60]  He claims that when this "correct" map is used, he was not within a firearm-free school zone at the time of the stop.[61]

III.    LAW & ANALYSIS

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. "The exclusionary rule, a judicially created deterrence measure, provides that evidence obtained

---

[55] R. Doc. 40 at 1-3.
[56] *Id.* at 2.
[57] *Id.* at 2-3.
[58] *Id.* at 3.
[59] *Id.* at 4.
[60] R. Doc. 43 at 1.
[61] *Id.*

by an unreasonable search or seizure generally may not be used as evidence of guilt at trial." *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022). "Warrantless searches and seizures," such as the one here, "are *per se* unreasonable subject to certain narrow exceptions." *Id.* When a warrantless search or seizure is at issue, "[t]he government bears the burden of showing an exception applies." *Id.*

Officers are permitted to make warrantless investigatory stops "based on reasonable suspicion that the person is engaged in criminal activity or wanted in connection with a completed felony." *Id.* (citing, *inter alia*, *Terry v. Ohio*, 392 U.S. 1, 27-31 (1968)). "In an analytical framework inspired by principles discussed in *Terry v. Ohio*, [courts in the Fifth Circuit] review the legality of police investigatory stops in a two-part test." *United States v. Henry*, 37 F.4th 173, 176 (5th Cir. 2022) (footnote omitted). That test requires courts to "first examine whether the officer's action was justified at its inception and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.* (footnote omitted). In conducting a "reasonable suspicion" inquiry, courts "'must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.'" *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.*

When weighing the totality of the circumstances, "a court may not consider the relevant factors in isolation from each other." *Id.* (citing *Arvizu*, 534 U.S. at 274); *see also United States v. Jacquinot*, 258 F.3d 423, 427-28 (5th Cir. 2001) ("The reasonable suspicion analysis is a fact-intensive test in which the court looks at all circumstances together to weigh not the individual

8

layers, but the laminated total." (citing *United States v. Zapata-Ibarra*, 212 F.3d 877, 881 (5th Cir. 2000))). "Relevant facts and considerations may include a description of a suspect, a suspect's location and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience." *Alvarez*, 40 F.4th at 346. Thus, "[f]actors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." *Jacquinot*, 258 F.3d at 427-28 (citing *Zapata-Ibarra*, 212 F.3d at 881).

Here, the Court expressly finds that Detective Dulaney credibly testified that, at the time of the *Terry* stop, she had a reasonable suspicion that Bryant was carrying a gun in a firearm-free zone – namely the area designated by the NOCPC's then-most recent map (October 2024) as part of the zone for the Chartwell Center School. Dulaney testified that the stop occurred in the district where she normally worked and in the area of St. Charles Avenue to which she had been assigned for the duration of the 2025 Mardi Gras season. She was familiar with the NOCPC's October 2024 firearm-free zone map because she consulted it in preparation for the assignment. Dulaney was familiar with the firearm-free zone designated for the Chartwell Center School because she had viewed the map and had previously arrested people for having guns in that zone. Dulaney unquestionably testified that, when she saw Bryant, she thought that he had a gun in a prohibited area for two reasons – one, he was in a firearm-free school zone, and, two, he was on a parade route. Dulaney's testimony established that, with her experience on that beat and her prior consultation of the NOCPC's October 2024 firearm-free zone map, she had a reasonable suspicion to stop Bryant for being within that firearm-free zone. Even if the October 2024 map was inaccurate, as Bryant suggests, Dulaney was still reasonable in relying upon it to make the stop as it was the then-most current map produced by the entity tasked with the responsibility for

producing such a map. *See* La. R.S. 14:95.6(D) ("The local governing authority which has jurisdiction over zoning matters in which each firearm-free zone is located shall publish a map clearly indicating the boundaries of each firearm-free zone."). For the City of New Orleans, that is the NOCPC. Because Dulaney had reasonable suspicion that Bryant had a gun within a firearm-free school zone, it is of no moment that she and the other officers thought that firearms were also prohibited on parade routes. Thus, the Court need not determine whether La. R.S. 14:95.2 could reasonably be read to prohibit the carrying of firearms on parade routes. In sum, Dulaney made a *Terry* stop based on reasonable suspicion, and Bryant's motion to suppress must be denied.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Bryant's motion to suppress (R. Doc. 27) is DENIED.

New Orleans, Louisiana, this 25th day of March, 2026.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE